UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DIANNE H. PRICE                          CIVIL ACTION

VERSUS                                   NUMBER: 09-3511

MICHAEL J. ASTRUE,                       SECTION: "R"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 12, 14).

Dianne H. Price, plaintiff herein, protectively filed the subject applications for DIB and SSI benefits on July 17, 2006 and January 29, 2007, respectively, alleging disability as of June 29, 2006. (Tr. pp. 76-80, 81-83, 159).[1]/ In a Disability Report that

_____

[1]/ Plaintiff had apparently filed a previous application for DIB which was denied at the initial level of the Commissioner's

appears in the record, the conditions resulting in plaintiff's inability to work were identified as "[s]coliosis vertabrate-disc out of spine painful back pain." (Tr. pp. 151-158). Plaintiff's applications were denied at the initial level of the Commissioner's administrative review process on January 3, 2007, following which she requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. pp. 34, 35-38, 187, 39-41). Pursuant to that request, a hearing before an ALJ went forward on January 28, 2008 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 21-33). On February 27, 2008, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 12-20). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on June 26, 2009, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-4, 5-8). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment plaintiff alleges that the ALJ failed to give controlling weight to the opinions of her treating physician. (Rec. doc. 12-2, p. 6). Relevant to the

---

administrative review process on September 25, 2003 and was not appealed further. (Tr. p. 160).

resolution of that issue are the following findings made by the ALJ:

1.  [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  [t]he claimant has not engaged in substantial gainful activity since June 29, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.  [t]he claimant has the following severe impairments: history of cerebrovascular accident, history of cervical disc disease, and scoliosis (20 CFR 404.1520(c) and 416.920 (c)).

4.  [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work except for no climbing of ladders or scaffolds, only occasional climbing of stairs and ramps, and no work around temperature extremes.

6.  [t]he claimant is capable of performing past relevant work as a salesclerk at a retail store. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  [t]he claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

(Tr. pp. 17-20).

Judicial review of the Commissioner's decision to deny DIB or

SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social

Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.   an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.   an individual who does not have a "severe impairment" will not be found to be disabled.

3.   an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. <u>Villa</u>, 895 F.2d at 1022; <u>Hollis v. Bowen</u>, 837 F.2d 1378, 1386 (5th Cir. 1988); <u>Epps v. Harris</u>, 624 F.2d 1267, 1274 (5th Cir. 1980). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

At the time of the administrative hearing that was held on January 28, 2008, plaintiff was forty-seven years of age, had completed ten years of formal education, and had past relevant work experience as a sales associate. She had last worked on June 30, 2006 and apparently suffered a stroke after going on vacation subsequent to that date. Plaintiff then collected short-term disability benefits until December of 2006 as well as one week of unemployment benefits.

Plaintiff lived with her daughter and two grandchildren. On

good days, plaintiff was able to put clothes in the washing machine and make her bed but was typically unable to do much beyond folding clothes. Her daughter reportedly did all the cooking after plaintiff had dropped a pot. Otherwise, she spent her time sitting, watching TV, and taking her medication. Plaintiff possessed a driver's license but did not drive secondary to neck problems and blurred vision. Further testing was being done to address circulation problems. Plaintiff testified that she took her medications as prescribed and that her blood pressure had improved to a point where she did not have to take medication for it everyday, only when it spiked. Plaintiff did get out of the house three to four times per week which included accompanying her daughter to the store. She estimated that she could stand and/or walk for four hours at a time and could sit four to six hours at a time. Plaintiff alternated between standing/walking and sitting throughout the day. She vaguely complained of leg problems.

Patricia Ehrlinger, a VE, was the second witness to testify at the hearing. She first classified plaintiff's past work as a sales associate as light, semi-skilled work. When directed to the results of a physical residual functional capacity assessment that had been rendered by Dr. Anthony Scardino on January 3, 2007, the VE testified that the limitations set forth therein would not preclude plaintiff from performing her past relevant work.

However, when directed to the results of a form letter that had been completed by Dr. Talluri, one of plaintiff's treating physicians, on January 21, 2008, the VE testified that the limitations documented in that missive would render an individual unable to work. In closing, counsel argued that plaintiff's history of scoliosis and multiple problems due to her cardiovascular accident, as well as the findings of Dr. Talluri, warranted a finding of disability. (Tr. pp. 21-33).

The documentary evidence generated during the relevant time period begins with records from the Thibodaux Regional Medical Center ("TRMC") dated July 14, 2005. Following complaints of right shoulder pain, plaintiff underwent x-ray studies which demonstrated degenerative changes but no evidence of fracture or dislocation. (Tr. p. 238). Plaintiff returned to TRMC on February 16, 2006 for a pelvic ultrasound and a mammogram. (Tr. pp. 242-243). A second mammogram was performed on March 16, 2006 for comparison with the results of the first one. (Tr. p. 240). Plaintiff was next seen at to TRMC on March 19, 2006 for complaints of pain but x-rays of the chest were normal. (Tr. p. 241).

On July 7, 2006, plaintiff was seen by Dr. Raja Talluri of the Thibodaux Medical Clinic for treatment of an acute cervical sprain. (Tr. p. 323). She returned to the Clinic for further treatment of that condition on July 10, 2006. (Tr. p. 322). Cervical spine x-

rays performed the following day revealed mild osteoarthritic overgrowth findings in the lower to mid cervical region but no neural forminal encroachment, fractures, or dislocations were noted. (Tr. p. 237). An MRI of the thoracic spine that was performed at TRMC on July 18, 2006 was positive for mild scoliosis of the spine and a mild central disc bulge at the T1-2 level but with no evidence of compression, fracture, or spinal stenosis. (Tr. p. 233). An MRI of the cervical spine that was done that date revealed cervical spondylosis, a prominent disc protrusion at C4-5 with evidence of disc extrusion, and broad based disc bulges at the other levels of the spine. (Tr. pp. 234-236).

Plaintiff returned to Dr. Talluri on July 21, 2006 and reported feeling better with no more neck or back pain, only pain in the left arm. Muscle strength was 5/5 on the right but was 2/5 on the left and the assessment was cervical radiculopathy at C4-5. Plaintiff was to be referred to another physician for an epidural injection and was to avoid heavy lifting. (Tr. p. 321).

By correspondence dated July 26, 2006, Dr. Adolfo Caudra thanked Dr. Talluri for plaintiff's referral, remarking that there was significant MRI pathology consistent with degenerative disc disease and a prominent extrusion at C4-5. However, upon examination plaintiff was noted to be experiencing increasing headaches with mental status changes and Dr. Caudra questioned

whether those symptoms were related to a cerebrovacular accident ("CVA"), a subarachnoid hemorrhage, or drug overdose. Accordingly, plaintiff was immediately referred to the TGMC emergency room for further work-up and neurological evaluation. (Tr. p. 260).

Upon being admitted to TRMC, plaintiff was noted to be suffering from expressive aphasia and the initial impression was global aphasia, probable CVA, stable hypertension, and cervical disc disease. (Tr. pp. 213-214). Chest x-rays revealed moderate cardiomegaly with mild pulmonary venous hypertension. (Tr. p. 230). A CT scan of the head without contrast demonstrated ill-defined areas of low attenuation in the left temporal lobe deserving of further study but no evidence of acute bleeding or mass effect. (Tr. pp. 231-232). On July 27, 2006, plaintiff underwent a transthoracic echocardiogram which revealed good left ventricular systolic function and trace mitral and tricuspid regurgitation. (Tr. pp. 215-216). An MRI of the brain, with and without contrast, was also done that day, producing evidence of a subacute infarct in the left temporal and parietal lobes with clinical correlation suggested. (Tr. pp. 222-223). A bilateral carotid ultrasound showed less than 60% of stenosis in the visualized portions of the extracranial cervical carotid arterial system on either side and no significant stenosis in the visualized portions of both external carotid arteries. (Tr. pp. 224-225).

On July 28, 2006, plaintiff consulted further with Dr. Coleridge Franklin of TRMC. Plaintiff was oriented to place and was able to follow commands very readily but she appeared to be confused at times and had difficulty expressing herself with marked word finding problems. The doctor could not get plaintiff to cooperate during the sensory portion of the examination. Dr. Franklin's impression was cerebral infarct versus cerebral neoplasm. (Tr. pp. 217-219). A transesophageal echocardiogram was also performed on July 28, 2006 which revealed no source of intracardiac thrombi. (Tr. pp. 220-221). A CT angiogram of the head and neck, with and without contrast, was also normal with no enhancement of the previously detected subacute infarct of the left temporal and posterior left parietal lobes. (Tr. pp. 226-229).

On August 9, 2006, Dr. Caudra issued orders for plaintiff to begin physical therapy at a frequency of three times per week for four weeks to treat her cervical radiculopathy. (Tr. p. 295). Plaintiff then presented to the TRMC emergency room on August 12, 2006 with complaints of left earache, weakness, dizziness, and chest pain. Following evaluation the diagnosis was an earache to the left ear, chest pain, dizziness, weakness, and temporomandibular joint arthralgia with a differential diagnosis to rule out myocardial infarction. Plaintiff was discharged home with Vicodin and Motrin with instructions to follow up with her

physician in several days. (Tr. pp. 197-212).

On August 14, 2006, plaintiff's daughter completed the Administration's Adult Function Report on her mother's behalf. There, it was reported that plaintiff washed dishes three times per week and shopped with her daughter for a total of 2.5 hours weekly but was no longer able to cook or to drive. Plaintiff could not lift, squat, bend, reach, or stand or walk for long periods of time. She also had difficulties with memory, concentration, and attention. (Tr. pp. 162-169).

The medical records that were generated on August 15, 2006 indicate that plaintiff was evaluated by a physical therapist who noted moderate muscle spasm with minimal limitation of cervical range of motion with the potential for improvement said to be excellent. (Tr. pp. 296-298). In a Neck Disability Index form of that same date it was reported that plaintiff suffered from moderate pain which prevented her from lifting or carrying anything at all and that she could hardly read. It was also reported that plaintiff could not work, drive a car, or engage in any recreational activities whatsoever. (Tr. pp. 289-290). As part of her entry into the program of physical therapy plaintiff also completed a Medical History/Subjective Information form which elicited information about her condition. There, plaintiff indicated that her medical history was positive for a stroke,

arthritis, and scoliosis. She stated that she was still employed by a department store but was not working at the time and had missed forty-two days of work. Plaintiff had apparently suffered an on-the-job lifting injury with resulting pain to her neck, back, and shoulder which was rated as a "5". Plaintiff was additionally recovering from the stroke she had suffered. As a consequence of these two occurrences, plaintiff stated that she could not could not run, lift or carry, drive a car, reach overhead, or do house or yardwork. Using stairs, understanding others, and remembering things could only be accomplished with great difficulty. (Tr. pp. 291-292).

Thereafter, plaintiff attended physical therapy on a periodic basis until her discharge on November 2, 2006. (Tr. pp. 268, 270-286). In the interim, plaintiff had been seen at the Thibodaux Medical Clinic on August 21, 2006 for monitoring of her continued neck and back pain. Muscle strength was still 2/5 on the left but normal on the right. The diagnosis was cervical radiculopathy at C4-5 and plaintiff was directed to continue with physical therapy and medications which, as of August 15, 2006, consisted only of Ecotrin, Prevacid, and iron pills. (Tr. p. 320, 291). Plaintiff returned to the clinic on August 28, 2006 with complaints of pain and numbness around the lips and face. The diagnosis was cervical pain/radiculopathy and CVA and plaintiff was prescribed Lortab in

addition to the Ecotrin she was taking. (Tr. p. 319). In conjunction with her ongoing physical therapy, plaintiff completed a second Neck Disability Index form on September 7, 2006. As compared with the first one she had completed on August 15, 2006, plaintiff's pain was the same (moderate) but she could care for her own personal needs more easily, she could lift light to medium weights if they were conveniently positioned, she could read more, her headaches were less severe, concentration was slightly improved, her ability to work was slightly improved, and her sleep was improved. (Tr. pp. 287-288).

Also on September 7, 2006, an Administration medical examiner sought advice from one of its physicians as to when plaintiff's file should be updated in light of her possible stroke on July 25, 2006. (Tr. p. 177). The doctor, an internal medicine specialist, agreed that plaintiff's file be held for three months and then updated. (Tr. p. 178). On September 13, 2006, plaintiff's physical therapist issued a progress note indicating that after attending twelve sessions, plaintiff had experienced excellent improvement to her cervical range of motion which was now within normal limits. However, intermittent pain in the spine had improved only a little and was now at a level of "6". Continued treatment was recommended. (Tr. p. 294).

Plaintiff returned to Dr. Caudra on September 15, 2006 for

follow-up regarding her posterior neck pain that radiated into the left scapula, left shoulder, and left arm with a sharp tightness and numbness in that extremity. Plaintiff had just completed her course of physical therapy and felt that it had helped her overall by 60% and medications were helping as well. She was continued on Neurontin, Flexeril, and Ultram and was to be referred to a chiropractor. Plaintiff was also felt to be a candidate for cervical ESI's with fluoroscopy. (Tr. p. 259).

On September 20, 2006, plaintiff was seen again by Dr. Talluri for a check-up. The note from that date includes the notation that plaintiff "... need[ed] excuse Aug. 23, 06 until further notice." Plaintiff complained of neck pain and spasms but was seeing a chiropractor at the time and indicated that exercise was helping her condition. The check-off review-of-systems portion of the note contained no positive findings related to the musculoskeletal system. The impression was cervical radiculopathy, allergic rhinitis, and CVA. (Tr. p. 318). Plaintiff returned to Dr. Talluri on October 6, 2006 complaining of chest pain and palpitations and the fact that her neck pain was interfering with her physical and occupational therapy. This time, the review-of-systems portion of the note was checked off to indicate that there were positive findings respecting the musculoskeletal system. The impression was chronic neck pain and CVA and plaintiff was to continue with

15

therapy. (Tr. p. 317).

On October 25, 2006, a second Function Report-Adult form was filled out by plaintiff's daughter on plaintiff's behalf. There, it was reported that plaintiff could take care of her own personal needs but could not cook or drive. Three times per week plaintiff was able to fold clothes but it was a process that took her the whole day. Other housework or yardwork could not be performed and plaintiff could count change but could otherwise not handle personal finances. Plaintiff's lifting and reaching abilities were compromised as was her memory, task completion, concentration, understanding, and ability to understand instructions. She could walk for an hour before needing to rest for thirty minutes. (Tr. pp. 179-186).

Plaintiff was next seen by Dr. Talluri on October 30, 2006 who noted tenderness in the paraspinal area and referred plaintiff to a chiropractor. (Tr. p. 316). On November 2, 2006, plaintiff's physical therapist issued a discharge summary after plaintiff had attended twelve additional sessions since the previous update. Excellent improvement to plaintiff's cervical range of motion had been achieved which was now within normal limits. Improvement to plaintiff's intermittent neck pain was limited with the pain being rated as a "6". (Tr. p. 268). Plaintiff returned to Dr. Talluri on November 29, 2006 with complaints of a cough, headache, and pain.

The assessment was acute bronchitis and pharyngitis and medications were prescribed. (Tr. p. 315).

On December 9, 2006, plaintiff was consultatively evaluated by Dr. Samuel Gloss. In describing plaintiff's stroke-related medical history the doctor questioned the accuracy of some of the test results that had been performed at TRMC in July of 2006. The doctor further noted that plaintiff was able to perform household activities without difficulty and that her hobbies included sailing and fishing. It was estimated that plaintiff could lift a maximum of five to ten pounds, could sit for an hour, could stand for thirty minutes, and could walk one block. Medications included Cyclobenzapine, Diuril, Ultram, Percocet, Gabopentin, Flexeril, an iron pill, Ecotrin, and Nexium.

In the "review of systems" portion of his report, Dr. Gloss remarked that plaintiff had occasional blurriness, double vision, and headaches. There was no shortness of breath, chest pain, or palpitations. Plaintiff still had some residual weakness from her stroke but no sensory deficits. She was able to follow multiple-step commands and affect and mood were normal. Upon physical examination, plaintiff had normal gait and station and was able to heel-to-toe walk. Hand and arm function were intact on both sides but grip, pinch, and grasp were not tight secondary to weakness; handling and fingering were normal. Range of motion was intact in

all joints. Plaintiff was able to push, pull, reach, crouch, squat, and stoop; was able to climb on and off the examination table independently, and, could dress and undress herself. In summarizing his findings Dr. Gloss noted that plaintiff had some residual weakness, speech problems, and memory problems resulting from her stroke but was not on appropriate post-stroke medication. Dr. Gloss believed that plaintiff suffered from disk disorder but he saw no evidence of radiculopathy. Based on x-ray studies, plaintiff had a slight scoliosis to the left but the doctor believed that plaintiff's complaints of significant pain and limitations in walking were an exaggeration. In conclusion, Dr. Gloss felt that plaintiff may have problems with light work but would be able to perform work at a desk. (Tr. pp. 244-249).

Plaintiff returned to Dr. Talluri on January 2, 2007 with complaints of pain on the left side. The impression was poorly controlled hypertension and cervical pain/radiculopathy; Norvasc and Lortab were prescribed. (Tr. p. 313). The following day, an Administration physician reviewed plaintiff's file and completed a Physical Residual Functional Capacity Assessment form regarding plaintiff's capabilities. There, the physician concluded that plaintiff could occasionally lift twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability

to push and/or pull; could never climb a ladder/rope/scaffolds, occasionally climb a ramp/stairs, and could frequently perform various other postural maneuvers; had no manipulative, visual, or communicative limitations; and, was to avoid only concentrated exposure to extreme heat or cold. Based on those findings, the physician believed that plaintiff could perform light level work. (Tr. pp. 250-257). On that same date, an Administration disability examiner, based on the aforementioned physician's findings and his own review of the file, concluded that plaintiff could perform her past relevant work as she had described it and was, therefore, not disabled. (Tr. p. 187).

Plaintiff was next seen by Dr. Talluri on February 2, 2007 for a check-up and complaints of a sore throat, headaches, sneezing, and coughing. The assessment was acute sinusitis and acute pharyngitis and plaintiff was prescribed antibiotics and was given Clarinex and Nexium samples. (Tr. p. 312). Plaintiff failed to keep an appointment scheduled with Dr. Talluri for February 14, 2007. (Tr. p. 311). She did see the doctor on March 12, 2007 to obtain a refill on her medications and for complaints of easy bruising and dry skin. (Tr. p. 310). Another appointment scheduled for April 18, 2007 was missed. (Tr. p. 309).

On May 14, 2007, plaintiff returned to Dr. Talluri with complaints of left leg pain. Nexium and Lortab were prescribed.

(Tr. p. 308). A mammogram that was performed at TRMC on May 23, 2007 produced incomplete results with additional imaging evaluation being needed. (Tr. p. 264-266). The supplemental testing done on May 31, 2007 resulted in a recommendation that the nodular density was probably benign with a follow-up evaluation to go forward in six months. (Tr. pp. 262, 263, 267). On June 13, 2007, plaintiff was informed that she was entitled to Medicaid coverage effective April 1, 2007. (Tr. p. 339).

Plaintiff was next seen by Dr. Talluri on June 15, 2007 for an infection of her fingers and conditions affecting her nails and scalp. (Tr. p. 307). On July 9, 2007, she complained of pain to the right hip radiating to the leg as well as genitourinary issues. The impression was acute sacroiliitis and a urinary tract infection; Darvocet and Cipro were prescribed. (Tr. p. 306). Plaintiff returned to Dr. Talluri on August 21, 2007 to have paperwork completed. She was said to be "doing well" but complained of back pain and a burning pain in her right leg. Plaintiff's blood pressure was measured at 138/78. The assessment was CVA and hypertension and plaintiff was continued on her medications. (Tr. p. 305). In conjunction with this office visit Dr. Talluri completed a one-page form identifying his diagnosis/primary disabling conditions as CVA and hypertension, noting plaintiff's hospital admission from July 26 to 31, 2006.

Dr. Talluri further indicated on the form that plaintiff was permanently disabled beginning on the day of her hospital admission and was to avoid lifting, pulling, pushing, and hot temperatures. In answer to the question of whether plaintiff was considered to be house confined, which was defined as an individual unable to perform normal daily activities or unable to perform two or more activities of daily living, Dr. Talluri answered in the negative. (Tr. pp. 304, 333).

On October 4, 2007, plaintiff returned to Dr. Talluri with complaints of right hip pain. (Tr. pp. 302, 331). Plaintiff was next treated for acute pharyngitis and bronchitis on November 7, 2007. (Tr. p. 330). On January 16, 2008, plaintiff presented to Dr. Talluri with complaints of swelling in the legs for the previous two days and new pain in the calf. Swelling was noted bilaterally in the calf areas and there was increased pain on dorsiflexion. A bilateral lower extremity ultrasound was performed which revealed no deep venous thrombosis within either leg. Medications consisted only of aspirin. The impression was swelling and pain in the legs and status-post CVA. (Tr. pp. 327-329).

Plaintiff was seen by Dr. Talluri one final time on January 21, 2008. The chief complaint on this date was pain in both legs. The assessment was CVA and bilateral leg pain. (Tr. p. 326). On that same date, Dr. Talluri completed a pre-printed form that had

apparently been provided to him by plaintiff's attorney which elicited information about plaintiff's condition and the limitations resulting therefrom. On the form, the doctor identified his diagnosis of plaintiff as including CVA, mitral regurgitation, tricuspid regurgitation, and hypertension, conditions which had lasted or could be expected to last for twelve months. Symptoms included leg pain, numbness, and swelling. In answer to the question which asked the doctor to "[d]escribe in detail your patient's signs (relevant clinical findings, test results, etc.)", Dr. Talluri wrote "c/o headache/leg pain/numbness."

Answers to various other questions on the form were that plaintiff had to lie down for four hours at a time during the day for undisclosed reasons; that she could sit for up to four hours on a continuous basis and could walk for a total of one to two hours per eight-hour workday; that she could occasionally lift weights of up to five pounds but could not carry objects of any weight and could not bend, squat, climb, or reach. Plaintiff could use both hands for simple grasping but not for pushing/pulling of arm controls or for fine manipulation. Legs and feet could not be used for repetitive movements because of numbness. However, plaintiff was not restricted from work at unprotected heights or around moving machinery, work exposing her to marked changed in

temperature and humidity or other environmental irritants, or from driving a motor vehicle. In answer to the question, that followed, Dr. Talluri indicated that plaintiff could not travel on a daily basis by way of a bus or subway as a result of "CVA/HTN/Numbness." The only treatment plaintiff had received for her conditions was Ecotrin which had no limiting side effects. In answer to another question which asked whether plaintiff had a physical condition which had or could produce pain, the doctor answered in the affirmative and wrote "c/o leg pain/numbness." Finally, Dr. Talluri indicated on the form that plaintiff's prognosis was fair and that work on a regular and continuing basis would cause her condition to deteriorate. (Tr. pp. 334-338).

As noted earlier, plaintiff challenges the Commissioner's decision to deny Social Security benefits on one ground, namely, that the ALJ failed to give controlling weight to the opinions of her treating physician, Dr. Talluri, as set forth in the form letter that the doctor completed on January 21, 2008.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion. Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on other grounds by Sims v. Apfel, 530 U.S. 103,

120 S.Ct. 2080 (2000)).  A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown.  <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d 492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995)).  Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion.  <u>Newton</u>, 209 F.3d at 456; <u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985).  The Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians.  <u>Newton</u>, 209 F.3d at 453.

Plaintiff argues that the ALJ failed to give controlling weight to the information set forth in the form letter that was completed by Dr. Talluri on January 21, 2008, opting instead to give significant weight to the opinions of an Administration physician who had not personally examined plaintiff.  For the reasons that follow, the Court believes that the ALJ gave Dr. Talluri's January 21, 2008 opinions the weight that they deserved.

The form letter that plaintiff relies upon contains internal inconsistencies, is at odds with Dr. Talluri's own contemporaneous treatment notes, and is contradicted by other medical evidence of record. On the form, the doctor provided a diagnosis of CVA, mitral and tricuspid regurgitation, and hypertension. Yet, on the same day that he completed the form Dr. Talluri had evaluated plaintiff for complaints of bilateral leg pain and had rendered a diagnosis of only CVA and leg pain. In none of the treatment notes that he executed contemporaneously with plaintiff's clinic visits did he clearly make a diagnosis of mitral or tricuspid regurgitation. The only mention of those conditions came during the course of the workup that plaintiff received during her CVA episode in July of 2006 and the regurgitation was described as only being "trace". As respects the CVA episode, although Dr. Gloss would subsequently remark, following his consultative evaluation on December 9, 2006, that plaintiff had some residual weakness and speech and memory problems, the Court notes that by August 9, 2006, less than two weeks following the extensive workup, plaintiff was cleared to begin physical therapy. Plaintiff did so and by September 13, 2006, her cervical range of motion had improved and was within normal limits although she still complained of pain.

The transcript of the administrative proceedings below contains records documenting plaintiff's twenty clinic visits with

Dr. Tullari between July 7, 2006 and January 21, 2008. Yet, in only one of those contemporaneous treatment notes, the one dated July 21, 2006, did the doctor place any restrictions at all on plaintiff's activities and the only restriction that was imposed was to avoid heavy lifting.

Turning to the information contained within the form itself, after setting forth his diagnosis of plaintiff and indicating that those conditions were expected to last twelve months, Dr. Talluri failed to explain his answer to the latter question as was requested. When asked to describe in detail the relevant clinical findings and test results supporting his opinions, Dr. Talluri simply indicated that plaintiff had complained of headache, leg pain, and numbness. Question number six on the form asked if plaintiff had to lie down during the day and, if so, for how long and for what reason. Dr. Talluri answered that plaintiff had to lie down for four hours at a time but provided no reasons for that requirement. That the ALJ would ascribe no weight to Dr. Talluri's assertion, particularly in light of the fact that none of the records from any physician documented such a need, is entirely understandable. Plaintiff herself testified to no such need at the administrative hearing. To the contrary, she stated that she could stand and/or walk for four hours at a time and could sit for four to six hours at a time and that she alternated between

standing/walking and sitting throughout the day.

On the form letter, Dr. Talluri described the treatment plaintiff had received as consisting solely of Ecotrin. When asked to explain what physical condition plaintiff had which produced pain, the doctor simply wrote that plaintiff complained of leg pain and numbness. Even Dr. Talluri indicated that plaintiff could sit for four hours on a continuous basis but he failed to answer the question which asked for the total amount of time plaintiff could sit in an eight-hour workday. In answer to the remaining portions of question number twelve, Dr. Talluri indicated that plaintiff could not stand or walk on a continuous basis at all but then incongruously stated that plaintiff could walk for a total of one to two hours per eight-hour workday. How an individual who allegedly cannot walk on a continuous basis at all can cumulate enough time doing so throughout the day to total up to two hours is a mystery.

In answer to other questions on the form, Dr. Talluri stated that plaintiff could not use either hand to push or pull or for fine manipulation but did not explain his answers as requested. Curiously, Dr. Talluri indicated that plaintiff could not travel by bus on a daily basis due to the combined effects of "CVA/HTN/Numbness" only after stating that plaintiff's medical condition did not restrict her from driving a car or from

27

performing activities at unprotected heights, around moving machinery, or involving exposure to marked changes in temperature or humidity or around other irritants. These glaring internal inconsistencies render the form letter almost entirely meaningless. That the form was completed by Dr. Talluri only one week before the administrative hearing also raises the spectre that it was prepared in anticipation of litigation and is thus entitled to diminished weight. Harrell, 862 F.2d at 482.

In contrast to Dr. Talluri's form letter and clinic notes, the report generated by Dr. Gloss following his evaluation of plaintiff on December 9, 2006 is much more thorough and comprehensive. Given the fact that Dr. Gloss was selected by the Administration to perform a consultative evaluation on its behalf he was presumably of a conservative nature. Of concern to the Court, however, is that the findings rendered by Dr. Gloss were preclusive of light work activity which is the exertional level of the work that plaintiff had performed as a sales associate. Contrary to the findings made by the Administration physician, who had not examined plaintiff personally, Dr. Gloss believed it unlikely that plaintiff would be able to perform light work. (Tr. p. 247). As a result of her CVA, plaintiff continued to suffer from residual weakness, residual speech problems, and residual memory problems. (Id.). Dr. Gloss estimated that plaintiff could only walk one block, stand for

thirty minutes, and sit for an hour. (Tr. p. 244). Those limitations would appear to be preclusive of light work activity which requires "... a good deal of walking or standing, or .... sitting most of the time." 20 C.F.R. §§404.1567(b), 416.967(b). Dr. Gloss opined that plaintiff was a candidate for desk work but plaintiff's past work was not performed at a desk. Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for the purpose of obtaining a consultative neurological evaluation to assess the effects of plaintiff's lingering CVA-related deficits. In light of Dr. Gloss' findings, the Commissioner is also directed to evaluate plaintiff's applications at the fifth step of the sequential analysis set forth in §§404.1520 and 416.920.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for the purpose of obtaining a consultative neurological evaluation and further consideration of plaintiff's applications at the fifth step of the sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>20th</u> day of <u>July</u>, 2010.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE